## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| STEVEN COPELAND, | : | Civil Action No. 17-5780 (MAS) (LHG) |
| Plaintiff, | : | |
| v. | : | **OPINION** |
| MERCER COUNTY CORRECTION CENTER, et al., | : | |
| Defendants. | : | |

**SHIPP, District Judge**

Pro se Plaintiff Steven Copeland ("Plaintiff") filed a civil rights complaint under 28 U.S.C. § 1983 alleging violations of his constitutional rights. (Compl., ECF No. 1.) His claims arise out of an alleged unconstitutional transfer between correctional facilities, his placement in solitary confinement, excessive force, and the denial of adequate medical care. Presently before the Court is a Motion for Summary Judgment ("Motion") filed by Defendants Peter Charles, Warden Charles Ellis, Lt. Lyszczak,[1] and Deputy Warden Phyllis Oliver (collectively "Moving Defendants"), pursuant to Federal Rule of Civil Procedure 56. (Mot., ECF No. 33.) Plaintiff filed two responses to the Motion. (Pl.'s Resp. to Mot., ECF Nos. 60, 63.)[2] Moving Defendants filed a Reply. (Defs.'

---

[1] In his complaint, Plaintiff named this Defendant as "Lt. Lizac." The Court will employ the spelling used in Moving Defendants' Motion.

[2] Plaintiff also belatedly filed correspondence in response to Moving Defendants' Reply Brief on May 17, 2019. (Pl.'s Ltr., ECF No. 74.) That correspondence was not only out-of-time, L. Civ. R. 7.1(d)(2), but is an improper surreply that was filed without the leave of this Court, *see* L. Civ. R. 7.1(d)(6). The Court, accordingly, will not consider the arguments raised in Plaintiff's May 17, 2019 correspondence.

Reply Br., ECF No. 64.) For the reasons stated below, the Court will deny summary judgment on Plaintiff's claim for unconstitutional transfer in violation of the Sixth Amendment and grant summary judgment on the remaining claims.

## I.    PROCEDURAL BACKGROUND

On or about August 4, 2017, Plaintiff filed his Complaint against Moving Defendants, Mercer County Correction Center, and Essex County Correctional Facility. (Compl., ECF No. 1.) The Court permitted the Complaint to proceed but dismissed Defendants Mercer County Correction Center and Essex County Correctional Facility from the case. (Mem. Order, Sept. 14, 2017, ECF No. 12.) On November 17, 2017, Plaintiff submitted a letter request to add additional parties, specifically Warden Charles Green and Lt. Cornelius. (Correspondence, Nov. 17, 2017, ECF No. 21.) Before a decision had been rendered on Plaintiff's request, Moving Defendants filed the instant Motion. (Mot., ECF No. 33.) On October 12, 2018, the Honorable Lois H. Goodman, U.S.M.J., granted Plaintiff's letter application to add additional defendants. (Minute Entry, Oct. 12, 2018, ECF No. 44.) Shortly thereafter, Moving Defendants advised the Court that they wished to proceed on their Motion despite the addition of new defendants. (Resp., Oct. 15, 2018, ECF No. 47.)

## II.    FACTUAL BACKGROUND

This matter centers around the alleged unconstitutional transfer of Plaintiff from Mercer County Correction Center ("MCCC") to Essex County Correctional Facility ("ECCF"), and also includes claims related to Plaintiff's placement in solitary confinement, excessive force, and inadequate medical care. The parties have submitted limited record evidence in support of their respective arguments.

A.    Defendants' Statement of Undisputed Facts

On January 29, 2014, Plaintiff was ordered to be held as a pretrial detainee in MCCC, pending disposition of his criminal case. (Br. in Supp. of Mot. ("Br."), 4 ¶ 1, ECF No. 33-1.) On June 18, 2015, Plaintiff was transferred to ECCF at the direction of Warden Ellis "in order to maintain the safety and security of the institution" after an issue arose in Plaintiff's housing unit. (*Id.* 4 ¶¶ 2–3; Cert. of Warden Charles Ellis ("Ellis Cert.") ¶¶ 4–5, ECF No. 33-2.) Upon Plaintiff's transfer to ECCF, he was considered an inmate of ECCF. (Ellis Cert., ¶ 4.)

On May 22, 2017, Plaintiff was returned to MCCC to be available for his criminal trial. (Br., 4 ¶ 4.) While at MCCC, Plaintiff was housed in the Receiving and Discharge Unit ("R&D") in accordance with MCCC's practice to house inmates from other correctional facilities there. (*Id.* at 4 ¶ 5.) The R&D Unit is not solitary confinement and inmates housed there are provided the same privileges as those in a maximum-security unit. (Br. 4 ¶¶ 6–7.) While Plaintiff was being housed in R&D, he filed a grievance regarding his housing. (*Id.* at 4 ¶ 8.) Warden Ellis responded to the grievance "by advising [Plaintiff] that he was being housed in R&D until the conclusion of his trial and then he would be returned to [ECCF]." (Ellis Cert. ¶ 9.) In June 2017, upon the conclusion of his criminal trial, Plaintiff was returned to ECCF. (Br. 5 ¶ 12.)

Pertinent to Plaintiff's excessive force claim, Standard Operating Procedure at MCCC requires "that for any incident in which force is used, both a use of force report and an incident report must be submitted." (*Id.* at 5 ¶ 9.) A search of MCCC's files failed to reveal any reports regarding use of force by Lt. Lyszczak against Plaintiff in June 2017. (Ellis Cert. ¶ 10.) Lt. Lyszczak submitted a certification in which he states:

> Any force that I apply against any inmate while acting as a
> Correction Lieutenant is done in a good faith effort to maintain or
> restore discipline or security. At no time did I impose force
> maliciously or sadistically against Plaintiff for the purpose of

3

> causing harm. Any force used was not excessive in nature given
> that Plaintiff suffered no injury.

(Cert. of Lt. Mark Lyszczak ("Lyszczak Cert.") ¶ 5, ECF No. 33-4.)

B.    Plaintiff's Statement of Undisputed Facts

Plaintiff was held as a pretrial detainee at MCCC and ECCF from January 28, 2014 to August 23, 2017. (Pl.'s Decl. ¶ 2, ECF No. 63-2.) In 2014, while being housed at MCCC, Plaintiff worked as a tier runner. (*Id.* ¶ 3.) This position required Plaintiff to clean the tier, distribute food and supplies, collect trash, and mediate disputes between officers and inmates. (*Id.*) In or around April 2015, while at the MCCC gym, Warden Ellis threatened to hold Plaintiff and other tier runners "accountable if any 'incidents' occur[ed]" on Bravo Pod Lower, Plaintiff's unit. (*Id.* ¶ 4.) Shortly thereafter, in June 2015, a fistfight occurred between an officer and inmate on Bravo Pod Lower. (*Id.* ¶ 5.) As a result of the altercation, the tier was on lockdown for the remainder of the day. (*Id.*) Plaintiff was not involved in the altercation and was never issued a disciplinary report related to the incident. (*Id.* ¶ 6.)

On June 18, 2015, Plaintiff was transferred from MCCC to ECCF without notice or a hearing. (*Id.* ¶ 8.) Plaintiff states he was never provided any reason for this transfer. (*Id.*) As a result of Plaintiff's transfer, his trial counsel was prevented "from visiting [Plaintiff] to confer in preparation of pretrial filings and trial." (*Id.* ¶ 9.) While being housed at ECCF, Plaintiff "was confined to a cell in 32 hour increments at least once a week" and never received his property, including legal documents, from MCCC. (*Id.* ¶ 10.) Plaintiff missed pretrial hearing dates as a result of his confinement at ECCF and contacted Judge Lydon of the Superior Court of New Jersey, Mercer County, regarding the missed hearings. (*Id.* ¶ 10.)

On May 22, 2017, Plaintiff was remanded to MCCC to stand trial on his criminal charges. (*Id.* ¶ 14.) At that time, Plaintiff was placed in a lock-up unit, where he "was handcuffed behind

4

[his] back, [and] shackled at the ankles each time [he] was removed from a cell." (*Id.* ¶¶ 15–16.) In June 2017, Plaintiff filed three grievances with Warden Ellis concerning his placement in lock-up, his transfer to ECCF, and his need to access the law library. (*Id.* ¶ 17.) In response, Warden Ellis told Plaintiff that he was placed in the lock-up unit because he was scheduled for trial and advised that Plaintiff would be returned to ECCF once his trial was completed. (*Id.* ¶ 18.) Warden Ellis did not respond to the other grievances. (*Id.*) During his trial, Plaintiff was permitted to use the single laptop computer at MCCC for a limited amount of time. (*Id.* ¶ 19.)

In or around June 2017, Plaintiff was slammed into a wall by Lt. Lyszczak for asking why he was being held in lock-up. (*Id.* ¶ 20.) At the time this incident occurred, Plaintiff was shackled at the ankles and handcuffed behind his back while being escorted to solitary recreation. (*Id.*)

While Plaintiff was housed in lock-up at MCCC, he was diagnosed with depression and "massive" headaches. (*Id.* ¶ 21.) He was prescribed medication for these conditions but was denied those prescriptions for a period of 44 days. (*Id.* ¶¶ 21, 23.) Upon his return to ECCF, doctors found that his condition had worsened and diagnosed Plaintiff with post-traumatic stress disorder ("PTSD") and depression. (*Id.* ¶ 23.)

At some point following Plaintiff's conviction in June 2017, the Superior Court of New Jersey contacted MCCC to schedule an interview with Plaintiff for the pre-sentence report. (*See id.* ¶ 25.) MCCC staff reported to the Mercer County Superior Court that Plaintiff refused the interview, however, Plaintiff states that he was never informed of such an interview. (*Id.*) On August 11, 2017, Plaintiff was transported to Mercer County Superior Court where he learned that the State had filed a motion for extended term sentencing. (*Id.* ¶ 24.) Plaintiff was sentenced to the maximum allowable sentence due to a lack of mitigating factors. (*Id.* ¶ 26.)

5

Plaintiff also submitted certain documentary evidence in opposition to the Motion. He includes what appears to be logbook entries of Bravo Pod Lower, showing that on June 17, 2015, a Code Six was called with the unit being placed in lockdown. (ECF No. 60-2 at 5–6.)[3] Plaintiff provides a certification from Sherief Treadwill, who was cellmates with Plaintiff while they were incarcerated at MCCC. (*Id.* at 15–17.) The certification states that Mr. Treadwill, as well as numerous other inmates, were moved from MCCC to other facilities while awaiting trial. (*Id.*) In addition, Plaintiff attached correspondence he sent to New Jersey Superior Court Judge Lydon on June 25, 2015, which states that he was never produced for his court appearance scheduled on June 22, 2015. (*Id.* at 20–21.) The correspondence further states that Plaintiff was stripped of all his legal documents, consisting of his lawyer's address and telephone number when moved to ECCF, making him unable to contact his lawyer about his case and his next court appearance date. (*Id.* at 20.) Plaintiff also requested his attorney's contact information. (*Id.* at 21.)

Plaintiff attaches a copy of his pre-sentence report, which states that "[t]he defendant refused to be interviewed for this report." (ECF No. 60-2 at 79.) Plaintiff also attaches various grievances sent to Warden Ellis on June 4, 2017, which are illegible.[4] (ECF No. 60-5 at 2–5.) Regarding his medical care, Plaintiff attaches a medical record from MCCC dated June 15, 2017, in which he was prescribed Zoloft for symptoms of depression. (ECF No. 60-5 at 10.) Plaintiff also attaches documentation showing he requested his complete medical records. (*Id.* at 14–15.) Finally, Plaintiff attaches a medical record from New Jersey State Prison, dated August 23, 2017, in which he complained of depression. (*Id.* at 17.)

---

[3] Many of the logbook entries are illegible.

[4] The one that is legible, was referenced by Defendants, above.

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 permits a court to award a party summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if supported by evidence such that a reasonable jury could return a verdict in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251-52 (1986); *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). A fact is material if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *See Anderson*, 477 U.S. at 248; *Kaucher*, 455 F.3d at 423. In determining whether a genuine dispute of material fact exists, the Court must view the facts and all reasonable inferences drawn from those facts "in the light most favorable to the [non-movant]." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party then carries the burden to "designate specific facts showing that there is a genuine [dispute] for trial." *Id.* at 324 (internal quotation marks omitted). Moreover, the non-moving party "may not rest upon the mere allegations or denials of [the] pleading." *Id.* at 322 n.3 (quoting Fed. R. Civ. P. 56(e)). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. A mere "scintilla of evidence . . . will be insufficient." *Anderson*, 477 U.S. at 252.

## IV. ANALYSIS

### A. Unconstitutional Transfer

Moving Defendants contend that Plaintiff has failed to demonstrate that his transfer from MCCC to ECCF violated his constitutional rights. (Br. 6.) Specifically, Moving Defendants assert that Plaintiff's claim fails because he has failed to demonstrate that his Sixth Amendment rights to effective assistance of counsel and a speedy trial were impinged by his transfer, or that the transfer was punitive in violation of the Eighth Amendment. (*Id.* at 6–9.) Moreover, Moving Defendants maintain that Plaintiff's transfer was not in violation of the New Jersey Administrative Code. (*Id.* at 10–11.)

#### 1. Sixth Amendment

Pretrial detainees, unlike sentenced inmates, retain certain protected liberty interests under the Constitution as the restraint placed upon such detainees is intended "only as a means to ensure their eventual presence at trial and sentencing." *Cobb v. Aytch*, 643 F.2d 946, 957 (3d Cir. 1981). In *Cobb*, the Third Circuit considered the constitutional implications of the transfer of several pretrial detainees from the Philadelphia County Jail to state prisons ranging from 90 to 300 miles from Philadelphia County. *Id.* at 949–50. As a result of the transfers, counsel for the pretrial detainees were unable to conduct initial interviews to prepare their cases and the transferees missed numerous court appearances. *Id.* at 951. Relying on factual findings made by the district court, the Third Circuit determined that these transfers impinged the pretrial detainees' Sixth Amendment rights to the effective assistance of counsel and to a speedy trial. *Id.* at 957–60. Because the transfers in *Cobb* infringed upon these constitutionally protected liberty interests, the Third Circuit

8

determined that the pretrial detainees were entitled to the procedural protections of notice and an opportunity to challenge the transfers. *Id.*[5]

The Sixth Amendment protects certain fundamental rights of the accused to defend against any charges against them, including the right to the effective assistance of counsel. The right to assistance of counsel "attaches at the initiation of criminal proceedings and continues through sentencing." *Cobb*, 643 F.2d at 957 (citations omitted). Intrinsic in an accused's right to the effective assistance of counsel is the right to assist in the preparation of his own defense. *See, e.g.*, *Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978) ("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev'd on other grounds sub nom.*, *Bell v. Wolfish*, 441 U.S. 520 (1979); *De La Rosa v. United States*, Civ. No. 94-7623, 1995 WL 251302, at *1 (E.D. Pa. Apr. 25, 1995) ("The Sixth Amendment guarantees defendants the right to assist in their defense and to have effective assistance of counsel." (citing *Gov't of the V.I. v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989))).

The Court finds that Moving Defendants have failed to demonstrate that there is no dispute of material fact as to whether Plaintiff's Sixth Amendment rights were infringed by his transfer to

---

[5] Plaintiff argues that, pursuant to *Cobb*, Moving Defendants were required to provide him with notice and an opportunity to challenge his transfer to ECCF. The Court's reading of *Cobb* does not support the position that all pretrial detainees are entitled to procedural due process protections when they are transferred between facilities. Rather, *Cobb* holds that where the transfer of a pretrial detainee impinges on a federally protected liberty interest, certain procedural protections arise. *See, e.g.*, *Demeter v. Buskirk*, No. 03-4761, 2004 WL 414052, at *5 (E.D. Pa. Mar. 1, 2004) (denying due process claim where the plaintiff was not provided notice or a hearing before his transfer to another jail but "failed to adduce any evidence demonstrating that the transfer . . . substantially interfered with his speedy trial and effective assistance of counsel rights under the Sixth Amendment."); *Ford-Bey v. Lowe*, Civ. No. 85-5873, 1986 WL 9247, at *2-3 (E.D. Pa. Aug. 25, 1986) (explaining that critical to the outcome in *Cobb* was the district court's findings that the pretrial detainee's Sixth Amendment rights were infringed as a result of their transfers); *see also Ervin v. Busby*, 992 F.2d 147, 150 (8th Cir. 1993) ("[T]he due process clause is not implicated when a pretrial detainee is transferred from one prison to another.").

9

ECCF. In support of his claim, Plaintiff presents evidence that he missed at least two court hearings as a result of his transfer, (Pl.'s Decl. ¶¶ 9–14; ECF No. 60-2, at 19–22), and that he had difficulty communicating with his public defender, (Pl.'s Decl. ¶ 9). Despite this evidence, Moving Defendants argue that Plaintiff has not demonstrated that his Sixth Amendment rights were violated by his transfer to ECCF. (Br. 6.) Moving Defendants acknowledge Plaintiff's allegations that he missed multiple court appearances as a result of his transfer, but they nevertheless argue that he has only presented record evidence of one missed court appearance, which he referenced in correspondence to the trial court, and that correspondence with his counsel contradicts Plaintiff's statement that he had no way to contact his attorney. (Reply Br. 3.) Moreover, Moving Defendants argue that the distance between MCCC and ECCF is far less than the transfers at issue in *Cobb* and request the Court to take judicial notice that MCCC and ECCF are less than 70 miles apart. (Br. at 6.)

While the distance between the locations is not as substantial as the distances at issue in *Cobb*, the Court is not convinced that no rational trier of fact could find that Plaintiff's Sixth Amendment rights were infringed by his transfer from MCCC to ECCF. The Court's review of the documentary evidence produced by Plaintiff demonstrates that he missed at least two court hearings in his criminal case—on June 22, 2015 and around March 6, 2016. (*See* ECF No. 60-2, at 20–22.) The record includes one letter between Plaintiff and his counsel and the record is noticeably deplete of any other correspondence between Plaintiff and his counsel. (*See* ECF No. 60-2.)

Moreover, evidence presented by Plaintiff that he was denied the opportunity to be interviewed for his pre-sentence report raises additional questions as to whether his Sixth Amendment rights were impinged by his transfer to ECCF. The pre-sentence report states that

Plaintiff was in the custody of MCCC at the time the investigation was conducted and that he "refused to be interviewed for this report." (ECF No. 5-3, at 82, 98.) Plaintiff states in his declaration that he was never contacted about the interview. (ECF No. 63-2 ¶ 25.) It is unclear from the pre-sentence report whether Plaintiff was actually in the custody of MCCC when they attempted to schedule an interview with him. There is no dispute, however, that Plaintiff's trial concluded on June 17, 2017 and that shortly thereafter, on June 23, 2017, he was returned to ECCF where he was detained until his sentencing on August 11, 2017. (*See* Pl.'s Decl. ¶¶ 22, 24.) Plaintiff states that MCCC informed neither the trial court nor his counsel that he had been returned to ECCF shortly after the conclusion of his trial. (ECF No. 60-1, at 5.) Moreover, Plaintiff states that he was never informed of a motion for extended term sentencing until he appeared for sentencing and that no mitigating factors were presented in his defense. (*Id.*)

It is well-established that "[t]he right to remain at liberty continues until a court pronounces a judgment of sentence." *Cobb*, 643 F.2d at 962. Even after his conviction was rendered, Plaintiff continued to "retain important [S]ixth [A]mendment rights to a speedy trial and effective assistance of counsel." *Id.* Thus, at the point that the pre-sentence investigation was conducted, Plaintiff retained his Sixth Amendment rights to counsel and to assist in the preparation of his defense. Moving Defendants have presented no evidence to refute Plaintiff's claims regarding the potential Sixth Amendment infringements that occurred between his conviction and the sentencing hearing.

Considering this evidence in the light most favorable to Plaintiff, *see Matushita*, 475 U.S. at 587, the Court cannot find that there is no dispute of material fact as to whether Plaintiff's Sixth Amendment rights were violated by his transfer from MCCC to ECCF. Summary judgment on this claim, accordingly, is denied.

### 2. Eighth Amendment

The transfer of a pretrial detainee may also be unconstitutional if it is intended to punish the detainee. *See Bistrian v. Levi*, 696 F.3d 352, 372–75 (3d Cir. 2012). In *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), the Supreme Court explained that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." Punishment in this context "refers to the punishment of a pretrial detainee for his alleged criminal conduct, committed *prior* to his detention, for which he has not yet been convicted," as opposed to "punishment of a detainee for his in-facility conduct that might violate the facility's rules and policies." *Steele v. Cicchi*, 855 F.3d 494, 504–05 (3d Cir. 2017); *see also Dewald v. Jenkins*, No. 16-4597, 2017 WL 1364673, at *4 (E.D. Pa. Apr. 13, 2017) (noting that the intent to punish under *Bell* "refers to the intent to punish for the crime the pretrial detainee is accused of, not an intent to impose discipline and order within a prison." (first citing *Bell*, 441 U.S. at 535; and then citing *Sandlin v. Conner*, 515 U.S. 472, 484 (1995))).

Here, Plaintiff makes no allegation that his transfer to ECCF constituted punishment for the criminal charges for which he was being detained. Instead, Plaintiff maintains that he was transferred to ECCF as punishment for conduct that occurred while he was incarcerated, namely, the fistfight that occurred on Bravo Pod Lower in April 2015. (*See* Pl.'s Decl. ¶¶ 4–8.) In this context, the Third Circuit has instructed that the analysis underlying *Bell* provides useful guidance. *Steele*, 855 F.3d at 505. In *Steele*, the Third Circuit adopted the approach of the First Circuit regarding application of *Bell* to claims of punishment for conduct that occurred during a pretrial detainee's incarceration, explaining that

> it may be divined that even if a restriction or condition may be viewed as having a punitive effect on the pretrial detainee, it is nonetheless constitutional if it also furthers some legitimate governmental object such as addressing a specific institutional

12

> violation and is not excessive in light of the seriousness of the violation. . . . If there is a reasonable relation between the sanctions and legitimate institutional policies, an intent to punish the detainee for prior unproven criminal conduct cannot be inferred.

*Id.* (quoting *Collazo-Leon v. U.S. Bureau of Prisons*, 51 F.3d 315, 318 (1st Cir. 1995)).

Thus, the relevant question for the Court is whether Moving Defendants had a legitimate governmental objective for transferring Plaintiff to ECCF. *See Steele*, 855 F.3d at 505. Warden Ellis maintains that Plaintiff was transferred in order to maintain the safety and security of MCCC. (Ellis Cert. ¶¶ 4–5.) Plaintiff, however, contends that his transfer was to punish him for the fistfight that occurred on his tier in June 2015, in which he was not involved. In support of this position, Plaintiff states that in April 2015, Warden Ellis informed Plaintiff and other tier runners that they would be "held accountable" for any incidents that occurred on their unit. (Pl.'s Decl. ¶ 4; ECF No. 60-2, at 15–17.)

It is well-established that "maintaining internal security and order in jails and prisons are 'legitimate governmental objectives' and that courts must give prison officials considerable discretion to manage internal security in their institutions." *Steele*, 855 F.3d at 505; *see also Sandlin*, 515 U.S. at 482–83 ("[F]ederal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment."). Indeed, such deference is afforded because "'assessing the seriousness of a threat' requires officials to do more than simply take stock of the 'specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se*, and the like.'" *Steele*, 855 F.3d at 505. (quoting *Hewitt v. Helms*, 459 U.S. 460, 474 (1983)). Plaintiff's transfer to ECCF was not excessive in light of this purpose. The evidence offered by Plaintiff suggests that following the June 2015 fight on Bravo Pod Lower, a number of inmates were transferred to other locations, demonstrating safety concerns regarding

the tier. Moreover, Plaintiff remained in the general population while housed at ECCF and enjoyed the same resources that were available to him at MCCC. The Court cannot discern from the record before it that Plaintiff's rights under *Bell* were violated by his transfer to ECCF and, accordingly, summary judgment on this claim is granted.

### 3.    Violation of the New Jersey Administrative Code

Plaintiff's final claim related to his transfer to ECCF is that it was in violation of New Jersey Administrative Code section 10A:4-9.21, which sets forth certain procedural requirements that must be followed when an inmate is transferred between correctional facilities based on a disciplinary infraction.[6]  Moving Defendants argue that summary judgment should be granted on this claim because Plaintiff's transfer was a discretionary decision made by Warden Ellis that did not implicate N.J. Admin. Code § 10A:4-9.21.

Generally, alleged violations of state law are not cognizable as claims under § 1983, which requires some violation of a federal constitutional right. *Elkin v. Fauver*, 969 F.2d 48, 52 (3d Cir. 1992). A violation of state law may nonetheless give rise to a cause of action under § 1983 in the context of a procedural due process claim, if a state law has created in it a liberty interest. *See Steele*, 855 F.3d at 507 ("The liberty rights protected by procedural due process are broader than those protected by substantive due process; they 'may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,''" or they "may arise from an expectation or interest created by state laws or policies." (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005))).

---

[6] Plaintiff additionally alleges in the Complaint that other sections of the New Jersey Administrative Code were violated, namely N.J. Admin. Code §§ 10A:4-9.5 and 10A:4-9.24. (Compl. 3.) These sections, respectively, pertain to the issuance of a disciplinary decision and the investigation of an infraction at a correctional facility. Neither appears to have been implicated here.

Neither Moving Defendants nor Plaintiff argues that Plaintiff had a protected liberty interest in the procedures set forth by N.J. Admin. Code § 10A:4-9.21. Nevertheless, whether or not Plaintiff has a protected liberty interest in these procedures, there is no dispute of material fact that the procedures set forth in that section were not applicable to Plaintiff. Plaintiff was not transferred to ECCF for disciplinary reasons and, thus, it was not necessary to follow its procedures. The Court, accordingly, will grant summary judgment on this claim.

B.    Solitary Confinement

Moving Defendants argue that at no point during his pretrial detention was Plaintiff housed in solitary confinement and, thus, summary judgment on this claim is merited. Moving Defendants maintain that MCCC does not have solitary confinement and that while Plaintiff was housed in R&D, he retained the same privileges as he would have in a maximum-security unit. Moreover, Moving Defendants contend that even if R&D is considered more restrictive housing, Plaintiff was provided with the appropriate due process procedures through which he could challenge his placement.

Generally, pretrial detainees do not have a protected liberty interest in being confined in the general prison population, but they do retain a liberty interest in not being detained in a more restrictive housing unit. *See Stevenson*, 495 F.3d at 70. Thus, when a pre-trial detainee is transferred to a more restrictive housing unit, he is entitled to certain due process protections. *See id.* Where a transfer is made for purely administrative purposes, prison officials are only required to provide "an explanation of the reason for [the] transfer as well as an opportunity to respond." *Id.* More protections are afforded where the transfer is made as the result of a disciplinary infraction and, under those circumstances, the detainee must be provided with written notice of the charges and there must be formal findings of fact as to the reasons for the disciplinary action. *Id.*

The Court will grant summary judgment on this claim in favor of Moving Defendants. Assuming that Plaintiff's housing in R&D was more restrictive than general population and constituted "solitary confinement," there is no dispute that Plaintiff was afforded the appropriate due process procedures to challenge his placement. Plaintiff filed a prison grievance to challenge his placement in R&D upon his return to MCCC. (Pl.'s Decl. ¶ 17.) Plaintiff states in his declaration that in response to that grievance, Warden Ellis informed him that he "was placed on the lock-up unit because [he] was scheduled for trial." (*Id.* ¶ 18.) Because there is no dispute that Plaintiff was informed of the reason for his placement on R&D and had the opportunity to challenge his placement through the jail's grievance procedures, there is no material dispute of fact and summary judgment on this claim is warranted.

C.    Excessive Force

Plaintiff's excessive force claim arises from an incident that occurred in June 2017 in which Lt. Lyszczak allegedly "slammed" Plaintiff into a wall while he was shackled at the ankles and handcuffed behind his back. (*See* Pl.'s Decl. ¶ 20.) Moving Defendants argue that there is no genuine dispute of material fact regarding Plaintiff's excessive force claim because Plaintiff has not presented any documentary evidence to support the essential elements of his claim.[7]

While Plaintiff does not provide a precise date of when he was allegedly "slammed into the wall," Plaintiff's declaration, which presents the facts of his case in chronological order, indicates that it occurred in June 2017 when he was still a pre-trial detainee. (ECF No. 63-2, at

---

[7] In their Reply Brief, Moving Defendants newly argue that summary judgment must be granted because Plaintiff failed to exhaust this claim. The Court will not entertain this argument. *See United States v. Coles*, 586 F. App'x 98, 100 n.3 (3d Cir. 2014); *Stern v. Halligan*, 158 F.3d 729, 731 n.3 (3d Cir. 1998) ("A party cannot raise issues for the first time in a reply brief.").

16

3.)[8] As a pretrial detainee at the time of the incident, the Court considers Plaintiff's excessive force allegations under the Fourteenth Amendment's Due Process Clause, which prohibits the State from imposing punishment on those who have not yet been convicted of a crime, rather than the Eighth Amendment's prohibition against cruel and unusual punishment. *Bell v. Wolfish*, 441 U.S. 520, 535–39 (1979). Courts must apply an objective standard when considering a pretrial detainee's claim of excessive force. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472–73 (2015). "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473. This objectiveness "turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Nevertheless, "[t]here exists some point at which the degree of force used is so minor that a court can safely assume that no reasonable person could conclude that a corrections officer acted maliciously and sadistically." *Reyes v. Chinnici*, 54 F. App'x 44, 48 (3d Cir. 2002); *see also Hudson v. McMillian*, 503 U.S. 1, 10 (1992) (observing that not "every malevolent touch by a prison guard gives rise to a federal cause of action").

The Court has been presented with two conflicting pieces of evidence on Plaintiff's excessive force claim. On the one hand, Plaintiff has submitted an affidavit stating that he was "slammed into the wall" by Lt. Lyszczak for asking why he was transferred to ECCF. (Pl.'s Decl.

[8] Moving Defendants premise their argument in support of summary judgment on this claim on the Eighth Amendment standard for excessive force. At no point, however, do they demonstrate that Plaintiff's claim is governed by the Eighth Amendment. Plaintiff alleges that the incident with Lt. Lyzsczak occurred in June 2017. At that time, Plaintiff remained a pretrial detainee under the law as he had not yet been sentenced. *See Bistrian*, 696 F.3d at 367 n.6 ("Although it is a misnomer, the case law often refers to an inmate awaiting sentencing—even if he has pled guilty to his crimes or been convicted after trial—as a 'pretrial detainee.'"); *Cobb*, 643 F.2d at 962 ("The right to remain at liberty continues until a court pronounces a judgment of sentence."). While the Court rejects Moving Defendants' argument under the Eighth Amendment, it will nevertheless grant summary judgment on this claim because Plaintiff cannot demonstrate that this incident constituted excessive force under the Fourteenth Amendment.

17

¶ 20.) Lt. Lyszczak and Warden Ellis, on the other hand, submit affidavits that no such incident occurred and, if such an incident did occur, the force used was made in "good faith" to maintain discipline. (Ellis Cert. ¶¶ 9–10; Lyszczak Cert. ¶ 5.) While these conflicting statements present an issue of whether the alleged incident occurred, they do not create a genuine dispute of material fact because there is no evidence on which a jury could return a verdict in Plaintiff's favor. *See Anderson*, 477 U.S. at 248. Plaintiff alleges that Lt. Lyszczak slammed him into a wall while he was handcuffed and shackled at his ankles. He does not, however, present any competent evidence that he sustained any injury as a result of this incident.[9] Plaintiff's description of the incident, acting alone, does not demonstrate that Lt. Lyszczak used more than *de minimis* force against Plaintiff. *Cf. Turzanski*, 2018 WL 5874073, at *7 (finding that an officer's use of force was *de minimis* where he allegedly threw the plaintiff against a wall before handcuffing him); *Jamison v. Varano*, No. 12-1500, 2015 WL 4662696, at *7 n.3 (M.D. Pa. Aug. 6, 2015) (expressing doubt that the plaintiff's allegation that he was "pushed into a wall and restrained in handcuffs," absent evidence of injury, amounted to more than *de minimis* force); *Ellis v. Vergara*, No. 09-2839, 2009 WL 4891762, at *4 (D.N.J. Dec. 15, 2009) (finding that a single allegation that an officer slammed an inmate's head against the gate of a holding celling was not sufficient to show that more than *de minimis* force was used). Because Plaintiff is not entitled to relief under the Fourteenth Amendment for a *de minimis* use of force, summary judgment is granted on this claim.

---

[9] Plaintiff states in his Response Brief that this incident resulted in him "bleeding profusely from the mouth." (ECF No. 60-1 at 18.) Plaintiff, however, does not present any competent evidence of this allegation in his declaration or his Statement of Undisputed Facts. (*See* Pl.'s Decl; Pl.'s Statement of Undisputed Facts, ECF No. 63-1.) The Court will not consider this assertion as it is well-established that "unsubstantiated assertions of 'fact' in a brief do not constitute evidence for the purpose of summary judgment.'" *Turzanski v. Cty. of Burlington*, No. 15-8866, 2018 WL 5874073, at *6 (D.N.J. Nov. 9, 2018) (citing *Versarge v. Twp. of Clinton N.J.*, 984 F.2d 1359, 1370 (3d Cir. 1993)).

18

## D. Inadequate Medical Care

Plaintiff's inadequate medical care claim is based on the failure of MCCC to transfer his medical records to ECCF. While Plaintiff was confined at MCCC during his trial, he was being treated for depression and "massive headaches." (Pl.'s Decl. ¶ 21.) As a result of MCCC's failure to transfer his records, Plaintiff was denied his medication for a period of 44 days until he was treated by medical staff at ECCF. (*See id.* ¶¶ 21–23.) Moving Defendants maintain that there is no record evidence establishing that they were involved in Plaintiff's alleged inadequate medical care stemming from the failure to forward his medical records to ECCF. (Br. 15–16.)

The facts underlying Plaintiff's inadequate medical claim appear to have occurred between June 2017 and August 2017, following Plaintiff's return to ECCF from MCCC. During that time period, Plaintiff had been convicted by a jury, but was still awaiting sentencing. As such, he remained a pretrial detainee during the period between June 2017 and August 2017. *See Bistrian*, 696 F.3d at 367 n.6 ("Although it is a misnomer, the case law often refers to an inmate awaiting sentencing—even if he has pled guilty to his crimes or been convicted after trial—as a 'pretrial detainee.'"). Thus, Plaintiff's claim properly arises under the Due Process Clause of the Fourteenth Amendment. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003). The Third Circuit has instructed, however, that the Eighth Amendment standard for inadequate medical care claim governs similar claims brought by pretrial detainees under the Fourteenth Amendment. *Id.* at 581–82.

The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To prevail on an inadequate medical care claim, a plaintiff must have a serious medical need and the acts or omissions of prison officials must indicate deliberate indifference to that need. *Id.* at 104–05. A prison official is

deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference may be manifested by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05. The Third Circuit has specifically found deliberate indifference when: (1) a prison official knows of the prisoner's need for treatment but intentionally refuses to provide it; (2) the prison official delays necessary medical treatment for non-medical reasons; or (3) the prison official prevents a prisoner from receiving needed or recommended treatment. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Mere negligence, however, does not rise to the level of an Eighth Amendment violation. *Id.* at 106.

Plaintiff contends that Moving Defendants failed to transfer his medical records to ECCF, evidencing deliberate indifference to his medical needs. Plaintiff, however, has presented no evidence to support his claim that Moving Defendants acted in a willful manner to delay or deny him medical treatment. There is simply no evidence linking Moving Defendants to the alleged harm. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs."). Plaintiff points to Moving Defendants' responses to his interrogatories, in which Warden Ellis stated that when a pretrial detainee is transferred to another facility, medical summaries are sent to the receiving facility. (ECF No. 63-4, at 5.) Even accepting that Plaintiff's medical records should have been transferred to ECCF and were not, the Court cannot discern any dispute of fact as to Moving Defendants' involvement in the alleged harm. There is no evidence showing that Moving Defendants, specifically, failed to forward Plaintiff's medical records, let alone did so deliberately. Further, while Plaintiff provides his own medical records which demonstrate that he suffered from

20

depression, the records in no way demonstrate that Moving Defendants were deliberately indifferent to Plaintiff's needs. Plaintiff's inadequate medical care claim against the Moving Defendants, accordingly, does not survive summary judgment.

## V. CONCLUSION

For the reasons set forth above, the Court will deny summary judgment in part and grant summary judgment in part. An appropriate order follows.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

**Dated**: July 30, 2019